STATE of Tennessee, Appellee,

v.

Jay A. CAMERON, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

March 30, 1995.

Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

Mike Jones, District Public Defender, Russel A. Church, Assistant Public Defender, Clarksville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Christina S. Shevalier, Asst. Atty. General, Nashville, Patrick H. McCutchen, District Attorney General, Arthur Bieber, Assistant District Atty. Gen., Clarksville, for Appellee.

## OPINION

WILLIAM M. DENDER, Senior Judge.

The appellant, Jay Cameron, was convicted in March 1987, along with co-defendant David Poe, of the felony-murder of Michael James Marlowe. Judgment was entered in August 1987. The appellant received a life sentence and co-defendant Poe was sentenced to death by electrocution. Mr. Poe's conviction was affirmed by the Tennessee Supreme Court. *See State v. Poe*, 755 S.W.2d 41 (Tenn.1988), *cert. denied*, 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 671 (1989). This Court has previously ruled that the evidence was sufficient to convict the appellant, however, the Court did not consider the issues raised in the motion for a new trial which was untimely filed. *See State v. Cameron*, No. 87–194–III, 1988 WL 115731 (Tenn.Crim.App. filed Nov. 1, 1988). The matter presently before the Court represents a delayed appeal from the appellant's conviction.

We find the delayed appeal is properly before this Court, but finding no merit in the issues raised by the appellant, we affirm the judgment of conviction.

## DELAYED APPEAL

First, we address the state's argument that this case is not a proper one for delayed appeal. For the reasons set forth below, the Court finds that the trial court properly granted a delayed appeal, and we consider the issues raised by the appellant on the merits.

On March 28, 1987, the appellant was convicted of felony-murder and was then sentenced to life imprisonment. On April 8, 1987, counsel for the appellant filed a "Mo-

tion for Transcript and Continuance" and a "Renewed Motion for Judgment of Acquittal." The motion for a new trial was not filed until May 15, 1987. On that same date, counsel filed a "Brief on Defendant's Motion for a New Trial" in which he argued that the motion for a new trial was not untimely since the "Motion for Transcript and Continuance" could be construed to be a motion for a new trial. Counsel also filed an "Amended Motion for a New Trial" in which he alleged that the motion for transcript and continuance "was in fact a motion for a new trial."

On May 26, 1987, the state filed a reply brief in which it addressed the issue of the untimeliness of the motion for a new trial, and the appellant filed a "Motion for Court to Enter Judgment Pursuant to Rule 32(e) of the Tennessee Rules of Criminal Procedure." On June 4, 1987, the trial court granted the appellant's motion to enter judgment and entered an order allowing the filing of a motion for a new trial. A standard sentencing order was then entered on the next day. The motion for a new trial was finally heard on August 14, 1987, and was overruled on August 27.

On appeal, this Court held that the trial court was without jurisdiction to consider the untimely motion for a new trial. Accordingly, this Court only considered whether the evidence was sufficient to support the verdict and affirmed the conviction. *See State v. Cameron*, No. 87–194–III, 1988 WL 115731 (Tenn.Crim.App. filed Nov. 1, 1988).

On March 13, 1989, the appellant filed a post-conviction petition alleging, among other things, that he was denied an appeal because trial counsel failed to timely file a motion for a new trial. Counsel was appointed to represent the appellant in the post-conviction proceedings. On August 26, 1992, the trial court granted a delayed direct appeal and retired all other issues raised in the petition. The appellant then filed a "Restated Motion for New Trial" and a "Notice of Appeal" on September 29, 1992. On December 4, 1992, the trial court overruled the request for a new trial. On January 27, 1993, the trial court entered an "Amended Post Conviction Relief" order, noting that the "parties having previously agreed that the Defendant is entitled ot [sic] a delayed appeal" and again overruling the request for a new trial and ordering that the notice of appeal filed in September 1992 be considered re-filed as of January 27, 1993. Both orders were approved for entry by counsel for the appellant and by the assistant district attorney.

After the case had been submitted to this Court, the state filed a supplemental brief arguing that the above-styled case is not a proper one for delayed appeal and that this Court should remand the case for proper post-conviction consideration. The appellant opposed the motion.

The Court agrees with the appellant that the state should not acquiesce in the granting of a delayed appeal and then, some 17½ months later, argue that the matter is not properly before this Court. The position taken by the state in the trial court is reflected by the assistant attorney general's signature on the order granting the delayed appeal. Thus, the state is now raising this issue for the first time on appeal. Questions not raised in the trial court will not be entertained on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.1983).

Regardless, we find that the delayed appeal is properly before this Court. Here, the state argues that the appellant was not denied his right to a direct appeal since the case was previously appealed and this Court considered the sufficiency of the evidence. The state contends that this matter should be remanded for a post-conviction hearing on the issue of ineffective assistance of counsel.

Contrary to the position taken by the state, this Court considered a delayed appeal in *State v. Johnny Wayne Brown*, No. 88–153–III, 1989 WL 41552 (Tenn.Crim.App. filed April 28, 1989), which was in a similar procedural stance. In the Court's opinion on direct appeal, we held that by failing to file a motion for a new trial, Mr. Brown had waived all of his issues except sufficiency of

the evidence. However, we considered the merits of all but one issue. In the delayed appeal, this Court considered the issue which should have been raised in a motion for a new trial and was not considered on the first direct appeal. Likewise in *Cole v. State,* 858 S.W.2d 915 (Tenn.Crim.App.1993), a delayed appeal was granted as in this case by agreed order of the parties. Moreover, in *Cole,* appellant had a direct appeal in which our court held that a suppression issue had been waived for failure to include a transcript. The delayed appeal by agreed order allowed appellant to have the suppression issue reviewed. *See also State v. Glenn Pardue,* No. 01C01–9302–CC–00048, 1993 WL 366548 (Tenn.Crim.App. Sept. 16, 1993) (delayed appeal by agreement of the parties despite waiver by failing to file transcript involving same trial judge and assistant district attorney general as the present case).

Here, we find that the trial court properly granted the appellant a delayed appeal in accordance with T.C.A. § 40–30–120, and we now consider on the merits the issues raised by the appellant.

### FACTS

The events of this case were aptly summarized in *State v. Cameron,* No. 87–194–III, 1988 WL 115731 (Tenn.Crim.App. filed Nov. 1, 1988):

The appellant, his co-defendant and the victim, Michael James Marlow [sic], were all members of the United States Army on active duty at Ft. Campbell, Kentucky. The murder occurred on the night of April 4, 1986 after the victim, the appellant and the co-defendant had been drinking beer together at a tavern near the military reservation, which straddles the Tennessee–Kentucky state line. According to the state's proof, the appellant and his co-defendant returned to the base by taxicab after the murder. The appellant vehemently denies that, contending that they walked back to the post. Since the victim was on a weekend pass, his absence was not noted until Monday, April 7, 1986, after which he was listed as being absent without leave. Of course, military authorities were unaware of what had happened to Private Marlow [sic].

On April 20 or 21, 1986, Private Poe told Private Gregory L. Gray that he had been involved in a murder, which occurred when they tried to "roll" a soldier to get his money. On the morning of April 25, 1986, Private Gray reported what Private Poe had told him to the Criminal Investigation Division (CID) at Ft. Campbell. Steve Chancellor, a special agent with the CID, immediately went to the field where he understood the homicide had occurred. There he found Private Marlow's [sic] badly decomposed corpse. The body was located about 600 feet south of the Tennessee–Kentucky state line in Montgomery County.

Later that morning, based upon the information that he had, Mr. Chancellor directed other military officials to take the appellant and Private Poe into custody on the post at Ft. Campbell. A short time later statements were given by both, admitting the robbery and beating of Private Marlow [sic] on April 4, but denying the murder.

The victim, Private Marlow [sic], met David Terrence McIntire, a Personnel Sergeant in the United States Army, at the Air Assault Club at Ft. Campbell early in the evening of April 4, 1986. After having a couple of beers there, Sergeant McIntire took Private Marlow [sic] to the Red Carpet Lounge so the young soldier, who had recently arrived at Ft. Campbell, could meet some young men of his age. When they arrived at the lounge, they met the appellant, whom Sergeant McIntire knew, and Private Poe, whom he did not know. The appellant introduced Sergeant McIntire to Private Poe and he in turn introduced Private Marlow [sic] to the appellant and Private Poe. The group drank several pitchers of beer, with Private Marlow [sic] purchasing two of them and other members of the group purchasing the others.

At about 8:30 or 8:45, Sergeant McIntire's wife came to the Red Carpet Lounge,

got him and took him home in her vehicle. He left his truck in which he and the victim had driven to the tavern. During the evening Private Marlow [sic] became intoxicated and left the tavern. He was found by Private Poe and the appellant lying in the back of Sergeant McIntire's truck.

During the evening the victim had been seen with some money. The appellant and his co-defendant induced him to go with them to the vacant field where they beat him and robbed him. A leather thong or shoelace was tied tightly and firmly around his neck. When his corpse was discovered the thong was tied with a circumference of approximately 12 inches. The victim's neck size was 15 to 15½ inches. Major Dennis W. Oberlies, M.D., Chief of the Department of Pathology at the Blanchfield Army Community Hospital at Ft. Campbell, testified that this ligature tied that tightly around the victim's neck would cause unconsciousness in about 10 seconds and death in five to fifteen minutes.

The victim's left jaw was fractured in two places and three teeth were missing. Some could have come out as a result of the decomposition of the corpse.

In their pre-trial statements, both the appellant and Private Poe freely admitted participating in the assault and battery of the victim and the robbery. However, each placed responsibility for the homicide upon the other. The appellant also testified at trial, fully admitting his participation in the offense. The appellant took $14.00 from the victim and gave Private Poe $10.00 of it. Private Poe took the victim's wallet and watch. The wallet was discarded at the edge of a pond near a construction site. Because they had blood on their shirts, the shirts were discarded in the same pond where the wallet was found, and, according to the appellant, they returned to the post without shirts. The shirts were also found in the subsequent search. The victim's partially burned Armed Forces identification card was found in a corn field, just as their statements indicated that it could be.

Both the appellant and Private Poe stated that the victim was alive when they left him near a path running through the vacant field. However, his body was actually 30 to 40 feet from the path when it was discovered three weeks later.

*Id.* at slip op. 5–8.

## SUPPRESSION OF APPELLANT'S CONFESSIONS

In his first issue, the appellant claims that the trial court erred in failing to suppress statements made by him on April 25, 1986. The appellant lists the following four sub-issues:

(a) The statement was obtained in violation of the appellant's right to military counsel.

(b) The statement was obtained in violation of the appellant's right to civilian counsel.

(c) The statement was obtained in violation of the *Posse Comitatus* Act.

(d) The statement was the fruit of a warrantless and therefore, illegal arrest.

The appellant's claims arise out of the concurrent jurisdictional nature of this case. Because the appellant was military personnel on active duty, he was subject to the provisions of the Uniform Code of Military Justice. *See* 10 U.S.C. § 801 *et seq.* Likewise, the appellant was also subject to civil jurisdiction since the crime occurred outside the perimeter of the Fort Campbell military base. A brief review of the concurrent nature of military and civilian jurisdiction will shed some light on the appellant's arguments.

Before 1969, civil courts had concurrent jurisdiction over offenses committed by military personnel which were punishable by court-martial. *See Franklin v. United States,* 216 U.S. 559, 30 S.Ct. 434, 436, 54 L.Ed. 615 (1910); *Coleman v. Tennessee,* 97 U.S. (7 Otto) 509, 513–14, 24 L.Ed. 1118, 1121 (1878). The fact that a crime was committed by military personnel off-base did not neces-

sarily limit the jurisdiction of a court-martial. *See Frazier v. Anderson*, 2 F.2d 36, 38 (8th Cir.1924).

However, in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), the United States Supreme Court held that a military court did not have jurisdiction to try a member of the Armed Forces who was charged with the commission of a crime cognizable in a civilian court, committed off-post, and having no military significance. *Id.* at 273–74, 89 S.Ct. at 1691–92. The Court in *O'Callahan* reversed the court-martial of a soldier who was convicted of the off-post assault and attempted rape of a civilian. The Court concluded that for "the crime to be under military jurisdiction [it] must be service connected, lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,' as used in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits on an indictment by a grand jury and a trial by a jury of his peers." *Id.* at 272–73, 89 S.Ct. at 1690–91.

The Court also recognized that "such crimes as theft from or robbery of an officer, *soldier*, post trader, or camp-follower ··· and manslaughter, assault with intent to kill, mayhem, or battery, *committed upon a military person;* inasmuch as they directly affect military relations, and prejudice military discipline, may properly be—as they frequently have been—the subject of charges under the present Article [134 of the Uniform Code of Military Justice]." *Id.* at 274 n. 19, 89 S.Ct. at 1691 (quoting W. Winthrop, *Military Law and Precedents* (2d ed. 1896, 1920 reprint, pp. 1124–1125)) (emphasis added).

The factors to be applied in determining whether a crime was "service-connected" were discussed in *Relford v. Commandant, United States Disciplinary Barracks, Fort Leavenworth*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). In *Relford*, the Court affirmed the conviction by court-martial of a soldier charged with kidnapping and rape, both of which were committed within the confines of a United States military base. *Id.* at 369, 91 S.Ct. at 657. The Court recognized as a significant difference between these two cases that in *O'Callahan*, the offenses were committed against a civilian in a civilian hotel while he was on leave and not in uniform, while in *Relford*, the offenses were committed on a military base against an employee of the base. *See Relford*, 401 U.S. at 364–66, 91 S.Ct. at 655–56. In *Relford*, the Court stressed "[t]he essential and obvious interest of the military in the security of persons and of property on the military enclave.... [and t]he responsibility of the military commander for maintenance of order in his command and his authority to maintain that order." *Id.* at 367, 91 S.Ct. at 656.

In June of 1987, three months after the appellant in the present case was convicted but two months before judgment was entered, the United States Supreme Court overruled *O'Callahan*. In *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), the Court held that the jurisdiction of a court-martial depends solely on the status of the accused as a member of the Armed Forces and not on the service connection of the offense charged. *Id.* at 437, 107 S.Ct. at 2925. The Court in *Solorio* upheld the court-martial of a soldier who was charged with numerous sex offenses with minor female dependents of fellow soldiers. These offenses occurred both on and off governmental property. The Court of Military Appeals had earlier affirmed the convictions on the basis that the offenses were service connected within the meaning of *O'Callahan* and *Relford*. However, the Court in *Solorio* was concerned that the service connection test was "confusing and difficult for military courts to apply." *Id.* at 448, 107 S.Ct. at 2932. The Court stated:

Since *O'Callahan* and *Relford*, military courts have identified numerous categories of offenses requiring specialized analysis of the service connection requirement. For example, the courts have high-lighted subtle distinctions among offenses committed on a military base, offenses committed off-base, offenses arising from events occur-

ring both on and off a base, and offenses committed on or near the boundaries of a base. Much time and energy has also been expended in litigation over other jurisdictional factors, such as the status of the victim of the crime, and the results are difficult to reconcile.

*Id.* at 449, 107 S.Ct. at 2932.

In an attempt to undo the "confusion wrought by the [*O'Callahan*] decision," the Court ruled that Art. I, § 8, cl. 14 of the United States Constitution, which grants Congress plenary power to make rules for the government and regulation of the land and naval forces, should be read "in accord with the plain meaning of its language as we did in the many years before *O'Callahan* was decided." *Solorio*, 483 U.S. at 450, 107 S.Ct. at 2933. This reading allows for the simpler jurisdictional test of status, that is, that a court-martial has jurisdiction over an offense based on the military status of the accused. *Id.* at 439, 107 S.Ct. at 2927.

■ The pendulum quality of these decisions illustrates the difficulty in separating jurisdictions when crimes committed by military personnel occur off-base and are recognizable by civilian courts. In fact and in practice, both courts have jurisdiction. In times of war, the military authorities have the preference in the exercise of jurisdiction, but otherwise, civil courts have concurrent jurisdiction to punish crimes against either federal or state laws committed in the United States by a person who is also subject to military law. The Court in *Solorio* noted:

> George Washington also seemed to have held this view. When informed of the decision of a military court that a complaint by a civilian against a member of the military should be redressed only in a civilian court, he stated in a General Order dated February 24, 1779:

> "All improper treatment of an inhabitant by an officer or soldier being destructive of good order and discipline as well as subversive of the rights of society is as much a breach of military, as civil law

and as punishable by the one as the other." 14 Writings of George Washington 140–141 (J. Fitzpatrick ed. 1936).

*Id.* at 445 n. 10, 107 S.Ct. at 2930.

In *O'Callahan, Relford,* and *Solorio,* the Supreme Court dealt with defining the jurisdiction of a court-martial. In the case before us, we are not concerned with the jurisdiction of an actual court-martial since the appellant was tried in a civilian court. Here, we are concerned with the pre-trial arrest procedures. The jurisdiction of the military to investigate a crime uncovered by military authorities involving military personnel has never been questioned. The jurisdiction of civil authorities in peacetime to investigate crimes committed by soldiers off-base has similarly never been questioned. The reasoning considered in reviewing concurrent jurisdiction issues must also be applied to pre-trial arrest procedures.

The disadvantage of concurrent jurisdiction is that the rights accorded the accused may differ between the two systems. As a practical matter, one jurisdiction is going to be more active in the initial arrest of a suspect depending on the physical location of the crime and of the suspect. On the other hand, the advantage of dual jurisdiction is the opportunity for cooperation between military and civilian authorities, which is what occurred in the present case. Here, civilian authorities were contacted as soon as it was determined that a homicide had occurred outside the perimeters of the military base, civilian authorities administered the *Miranda* warnings to the defendants, and civilian authorities were present during the questioning of both defendants.

10 U.S.C. § 814(a) provides in part:

> [A] member of the armed forces accused of an offense against civil authority may be delivered, upon request, to civil authority for trial.

Delivery upon request may be an event that evolves as the investigation evolves. The initial discovery of a crime does not always immediately indicate which court, ci-

vilian or military, will ultimately try the case. Usually, at some point in the investigation, as suspects are identified, and as the details of the crime are uncovered, it becomes clear to the investigators which jurisdiction will prevail. Until that time, it is incumbent upon the investigators to cooperate in the investigation and to ensure that the proper procedures are followed within whichever jurisdiction is more active at that moment.

■ The procedures that afford constitutional protections to a defendant are different in the two jurisdictions. Certain rights cannot be exercised in a military setting to the same extent that they can in a civilian setting. *See United States v. Jones,* 4 M.J. 589, 590 (C.G.C.M.R.1977). When someone initially comes under suspicion of committing a crime, the procedures of whichever jurisdiction suspects him are naturally in effect. When the accused is delivered from one jurisdiction to the other, the procedures from the receiving jurisdiction naturally come into play. An accused member of the Armed Services who is arrested on base and is subsequently delivered to civilian authorities may not always experience the full panoply of civilian procedures before he or she is delivered.

■ Concurrent jurisdiction does not mean concurrent procedures. What is important is that the accused's constitutional rights are protected even though he or she is in concurrent jurisdictions with different procedures being applied during the process of determining which jurisdiction will ultimately decide the case.

■ In the present case, the appellant was taken to the CID office at the military base where Detective Steve Poston of the Clarksville Police Department, in the presence of Agent Chancellor, advised the appellant of his constitutional rights. Detective Poston gave the appellant a standard *Miranda*-type copy of the rights form used by the Clarksville Police Department. The appellant read the form while Detective Poston also read the form aloud to him, and the appellant

signed the form. The appellant made an oral statement, which was tape recorded, implicating David Poe in the attack on the victim. At a certain point in the questioning, the appellant invoked his right to counsel, and the questioning immediately ceased. The appellant was taken to another room by Agent Jerry Marker and given lunch, while Detective Poston and Agent Chancellor questioned David Poe. After eating his lunch, the appellant requested to speak with Detective Poston and Agent Chancellor. Detective Poston and Agent Chancellor stopped questioning David Poe and met with the appellant. After satisfying themselves that the appellant was voluntarily resuming the interview and did not wish counsel, Detective Poston and Agent Chancellor resumed questioning him. The appellant gave an oral statement and a written statement which implicated himself in the attack and robbery of the victim.

First, the appellant argues that the statements he gave during that interview were obtained in violation of his right to military counsel. As authority, the appellant cites 10 U.S.C. § 831(b):

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Detective Poston testified that he and Agent Chancellor went into the office where the appellant was being held and introduced themselves. Next, Detective Poston advised the appellant of his rights, explained to him why they were there, and furnished him a copy of a waiver of rights form. According to Detective Poston's testimony, he gave the following rights advisement to the appellant:

Before we ask you any questions, you must understand your rights. You have

the right to remain silent, anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one. If you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Then there is the waiver of rights. I have read this statement of my rights and understand my—what my rights are, and am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me. No pressure or coercion of any kind has been used against me.

Clearly, this *Miranda*-type warning given to the appellant by Detective Poston fulfilled the constitutional protection of the accused. The appellant was advised of the nature of the accusation and of his rights. In response, the appellant stated that he understood his rights and that he was willing to make a statement. Even assuming that the warning failed to comply with the military procedure required by 10 U.S.C. Section 831(b), the issue is whether that failure results in the exclusion of the statements from a Tennessee criminal trial. We hold it does not.

In *United States v. Newell,* 578 F.2d 827 (9th Cir.1978) a navy serviceman was tried and convicted in federal court of arson and destruction of government property. Although initially interrogated by naval investigative service officers, the court martial proceedings were later dismissed and criminal proceedings in the federal court were initiated. Newell moved to suppress his statements on the basis that the naval investigators did not comply with certain military interrogation procedures. The trial court's denial of the motion to suppress was upheld on appeal. The court held that the exclu-

sionary rule was not necessary to deter noncompliance with military rules by military officials. Here, even if the initial interrogation procedure omitted some military requirements, those omissions do not require the suppression of the statement in the criminal case.

Later, when the appellant invoked his right to counsel, the questioning stopped immediately, and he was taken out of the room. Testimony of the interrogating officers shows they did not intend to interview the appellant further. In fact, while the appellant was being fed lunch, the officers began interviewing David Poe.

■ In his second sub-issue, the appellant contends that his statements were obtained in violation of his right to civilian counsel. As authority, the appellant cites *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), however, neither case supports the appellant's position. In *Minnick,* a prisoner was compelled to attend an interrogation without counsel after he had requested and had been provided counsel. This is unlike the present case.

Moreover, while *Mosley* is more on point, it is not in the appellant's favor. The Court in *Mosley* held that no constitutional violation occurred in a case where a prisoner, two hours after invoking his *Miranda* rights to not answer questions about a robbery, was re-*Mirandized* by a separate detective and was questioned about and confessed to a separate unrelated crime. *Id.* at 104–06, 96 S.Ct. at 327. In citing *Mosley,* the appellant is attempting to argue that once he invoked his right to cut off questions, he could not waive it. In fact, the Court in *Mosley* held:

[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of their circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive sus-

pects of an opportunity to make informed and intelligent assessments of their interests.

*Id.* at 102, 96 S.Ct. at 326. The Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questions' has been 'scrupulously honored.'" *Id.* at 103, 96 S.Ct. at 326.

A review of the transcript of the interrogation could lead a trier of fact to no other conclusion than that the interrogators were scrupulous in protecting appellant's right to cut off questions and that appellant reinitiated the conversation:

CHANCELLOR: Private Cameron, I understand now that you would like to continue to answer questions pertaining to this incident we talked about earlier, is that correct?

CAMERON: Yes sir.

CHANCELLOR: O.K., what I would like for you to do, please, before we go any further or before I will go any further, would you explain to me why, at this time, that you have changed your mind about, if I remember correctly, we stopped the interview because you wished to seek legal counsel, correct?

CAMERON: Yes sir.

CHANCELLOR: O.K. Have you had a chance to talk with legal counsel?

CAMERON: I decided that it would be best just to tell you what I know.

CHANCELLOR: O.K. Did we deny you any chance to speak to legal counsel?

CAMERON: No sir.

CHANCELLOR: Following the interview, following where we stopped with you, did we ask, did we ask you any additional questions?

CAMERON: No sir.

CHANCELLOR: We did about date of birth, place of birth, stuff like that,

CAMERON: Yes sir.

CHANCELLOR: But ...

CAMERON: Nothing pertaining to the incident.

CHANCELLOR: O.K. While you were out, did we make you any type of promises or anything like that about continuing to answer questions?

CAMERON: Not about questions, sir, just ... I was made the promise that I could speak to a chaplain or somebody, that was it.

CHANCELLOR: O.K. When did we say you could do that?

CAMERON: He's trying to get hold of my chaplain now, sir.

CHANCELLOR: Did you give him a request by name?

CAMERON: No request by name, sir, just a chaplain.

CHANCELLOR: O.K. Is it your wish to talk with a chaplain after the interview, before the interview, or ...

CAMERON: Some time before this evening, sir, before bed.

CHANCELLOR: O.K. But it's not necessary that you talk to a chaplain before this interview?

CAMERON: No sir.

CHANCELLOR: O.K. Am I to understand that this is a change of heart on your part?

CAMERON: Not really a change of heart, sir, it's just I've got to tell you what happened for my benefits because I understood and was given the impression that Poe was saying that I'm doing stuff that I did not do so, I'm a good Baptist boy, I may drink and I may smoke but I want to clarify this, not only for that, but for myself, too.

CHANCELLOR: O.K. So, even though you ask [sic] for legal counsel, you do not wish legal counsel at this time?

CAMERON: No sir, not at this time.

CHANCELLOR: O.K. You understand that you, this is part of your legal rights, that you have that right to have you a counsel?

CAMERON: Yes sir.

CHANCELLOR: O.K. And you understand that you can have legal counsel present with you now if you wish.

CAMERON: Yes sir, I understand.

CHANCELLOR: And you don't wish that at this time?

CAMERON: No sir, not at this time.

CHANCELLOR: At this time, you are willing to answer questions from Detective Poston and myself?

CAMERON: Yes sir.

CHANCELLOR: O.K. What we'd like to do at this time, understand that this is completely voluntary ...

CAMERON: Yes sir.

CHANCELLOR: O.K. And this is actually, you brought the subject up, to talk with us, is that correct?

CAMERON: Yes sir.

CHANCELLOR: O.K., we didn't ask you to come back here and talk with us again?

CAMERON: No sir.

■ Having reviewed the transcript of the appellant's interviews, we find that the appellant's right to counsel was not violated. The United States Supreme Court held in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." 451 U.S. at 485, 101 S.Ct. at 1888. If an accused remains silent and cuts off questioning, that silence must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313

(1975). If, on the other hand, a statement is made after the invocation of the right to counsel, the court must consider whether the accused initiated the further conversation, and whether, given the totality of the circumstances, the waiver of counsel was knowing and intelligent. *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

Given the trial court's explicit finding on the record before us, we find that appellant's silence was "scrupulously honored" and that the subsequent communication was initiated by appellant. Further, we agree with the trial court's conclusion that the totality of the circumstances supports a knowing and voluntary waiver of counsel. Thus, we find no merit in appellant's argument that his incriminating statements were obtained in violation of his right to military counsel or to civilian counsel.

■ In the appellant's third sub-issue, he contends that his statement was obtained in violation of the *Posse Comitatus* Act. The Act, which was originally enacted during the Reconstruction Era, provides:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. Section 1385.

This same issue was raised by the appellant's co-defendant and was aptly discussed in *State v. Poe*, 755 S.W.2d 41 (Tenn.1988):

The investigation in the present case commenced with military officials and involved exclusively military personnel. No case has been cited to us holding that there was a violation of the *posse comitatus* statute when both the victim and the perpetrators of the crime were on active military duty. In this case the actions of the military officers were performed primarily to accomplish military purposes;

that is, to investigate the death of one soldier at the hands of others.

We are of the opinion that no violation of the statute has been shown by the action of the military personnel in cooperating with civilian officials or in turning over to the civilian officials the arrested individuals and information concerning them.

*Id.* at 45.

We agree that the statute does not apply. Thus, we find that the appellant's statement was not obtained in violation of the *Posse Comitatus* Act.

■ In his final sub-issue, the appellant claims that his arrest was warrantless and therefore, illegal. Since the appellant was military personnel on active duty, he was clearly under the provisions of the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.* In *State v. Poe,* our Supreme Court held:

> The military code specifically permits the arrest of persons by authorized officials based upon reasonable belief that an offense has been committed and that the person apprehended committed it. 10 U.S.C. § 807(b). No warrant is required as appellant insists.
>
> At the time Poe and Cameron were arrested on the base, no Tennessee warrant had yet been issued, but civilian authorities promptly requested such a warrant. Apparently the military officials were not certain at the outset whether to retain the case under military jurisdiction for court martial or to turn the offenders over to civilian authorities for prosecution. The remains of Marlowe were first taken to a military hospital but were later released to the Deputy State Medical Examiner. Poe and Cameron were delivered to civilian authorities, and subsequently Tennessee state warrants were served on them.

We find nothing illegal about the arrest of these individuals at the instance of military authorities on the military base.

*Id.* at 44–45.

We agree. There was nothing illegal about the appellant's arrest, and therefore, his incriminating statements cannot be suppressed on those grounds.

Accordingly, we hold that the appellant's statements were not obtained in violation of his right to military or civilian counsel, nor in violation of the *Posse Comitatus* Act, nor as a result of an illegal arrest. Accordingly, we hold that the appellant's statements were properly admitted into evidence.

## VOIR DIRE

■ In another issue, the appellant contends that the trial court erred in requiring counsel to go forward with voir dire when they had only been in possession of the juror information required under Tenn.R.Crim.P. 24 for 15 minutes on days two and three of the jury selection. The appellant submits that even if permissible under Rule 24, this process violated the enhanced due process requirement in death penalty cases.

In response, the state submits that counsel for the appellant did not join counsel for co-defendant Poe in asking for a continuance, that the trial court substantially complied with the requirements of Rule 24, and that the appellant has failed to show any prejudice resulting from the time at which he received the list of jurors on the second and third days of jury selection.

Counsel was furnished a jury list prior to the first day of jury selection in accordance with Tenn.R.Crim.P. 24(g).[1] At the end of the first day, the initial list of jurors was exhausted, and it was necessary for the trial court to impanel additional jurors. The attorneys were given copies of the new list that

---

1. Tenn.R.Crim.P. 24(g) provides:
 Upon request the parties shall be furnished with a list of members of the jury panel, containing the following information with respect to each: name, address, occupation, name of spouse, occupation of spouse. The list shall also state whether each prospective juror has previously served on a criminal court jury; however, that information need not be provided prior to the day of trial.

night, however, sheets were not filled out on the potential jurors until the morning of the second day. Counsel for co-defendant Poe raised an objection and made a motion for a continuance, which was denied. Counsel for the appellant did not join in the motion but instead, requested that counsel be given 15–30 minutes to review the list of jurors. While this motion was denied, the trial court did take a 15-minute break before the potential jurors were questioned. On the third day, the same procedure was necessary after the second list of jurors was also exhausted. Both attorneys asked for a mistrial at that time. While the trial court denied the motions, there was a 25-minute recess during which the attorneys could review the jurors' cards.

Our Supreme Court has held that where prejudice is not demonstrated from failure to provide trial counsel with a list of prospective jurors, there is no basis for reversal. *State v. Harris,* 839 S.W.2d 54, 66 (Tenn.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). In *Harris,* noncompliance with Rule 24(g) was necessary because a special venire had been called for trial and because the trial court did not know who the prospective jurors would be. *Id.* Noncompliance was also necessary in the present case due to the exhaustion of the original list of jurors. Moreover, the trial court provided the necessary information to counsel as soon as it was available.

Finally, as pointed out by the state, the trial court's actions were reviewed in *State v. Poe,* 755 S.W.2d 41 (Tenn.1988), where our Supreme Court held that the trial court "substantially complied with the requirements of the Rules of Criminal Procedure." *Id.* at 46. Accordingly, the Court held that no reversible error was demonstrated and that the motion for mistrial was properly disallowed. *Id.* The appellant in the present case has also failed to demonstrate that he was prejudiced from the failure of his counsel to receive the list at an earlier time. No appreciable difference in the content or quality of counsel's examination of prospective jurors has been pointed out to this Court. This issue is without merit.

## CHAIN OF CUSTODY OF TAPED INTERVIEW

 In another issue, the appellant contends that the trial court erred in allowing the cassette tape of the appellant's confession to be introduced into evidence without requiring the state to establish the chain of custody.

At trial, Agent Chancellor, who assisted in interviewing the appellant, identified the tape of the appellant's interview:

Q: I will hand you this tape, and I will ask you if you recognize that?

A: Yes, I do.

Q: What is it?

A: This is the cassette tape that we used to record our first interview of the accused, Jay A. Cameron, on the 25th of April, 1986, at the CID office. I recognize this by Jay Cameron's signature affixed here and the date on the tape.

Q: Now, has that tape been transcribed?

A: Yes sir, it has.

Q: And have you had occasion to read that transcript of the tape, Agent Chancellor?

A: Yes, I have. And had a chance to compare it with the cassette itself.

Q: And is the transcription that has been made an accurate one as to the matters contained on the tape?

A: Yes sir, it is.

After this colloquy, the state requested that the tape be marked for identification, and counsel for the appellant objected based on a lack of chain of custody. The trial court overruled the objection and admitted the taped interview into evidence. The same foundation was laid for the introduction into evidence of the tape and transcript of the second interview. Again, the appellant's objection was overruled.

In response to the appellant's argument, the state submits that the trial court did not

abuse its discretion in admitting the cassette tape. *See Ritter v. State*, 3 Tenn.Crim.App. 372, 378, 462 S.W.2d 247, 249 (1970).

We do not think that the chain of evidence rule is applicable to these circumstances. The rule is that evidence must either be positively identified or be established by an unbroken chain of custody. The standard was set forth in *State v. Jones*, 598 S.W.2d 209 (Tenn.1980):

> [T]he tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

*Id.* at 223.

Agent Chancellor, who was present during the questioning of the appellant, was able to identify the cassette tape by the appellant's signature and by the date on the tape. Moreover, he testified that he had compared the transcript and the cassette itself and that the transcription was accurate as to the matters contained on the tape. We think this was sufficient authentication. This issue is without merit.

## WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TRIAL TO PROCEED PAST 5:30 P.M.

 In another issue, the appellant argues that the trial court erred by requiring the proceedings to continue past 5:30 p.m. on a Friday afternoon. After the introduction of evidence concluded at about 5:30 p.m., counsel for the appellant requested that closing arguments be delayed until the following day. Counsel for the appellant related to the court that he had only had two and a half hours of sleep the previous night. In denying the motion, the trial court indicated that the proceedings would continue until they reached a point where the case could be

concluded the next day. The trial court was concerned that the jury not be sequestered over a Sunday when court could not be held. The record reflects that counsel for the appellant began his closing argument at about 8:00 p.m., and court was adjourned around 9:30 p.m. During the evening, at least two recesses were called.

As pointed out by both parties, this issue was decided adversely to the appellant's co-defendant in *State v. Poe*, 755 S.W.2d 41 (Tenn.1988), where the Supreme Court noted:

> It is not contended that the trial judge unduly limited the time for final summation by any attorney or that counsel were in any way limited in developing their theories.

*Id.* at 47. The Court went on to hold that "this matter lay within the discretion of the trial judge, and no reversible error has been shown". *Id.*

First, the appellant argues a distinction in that his attorney had not had much sleep the night before. Second, the appellant submits that subsequent case law supports a finding of error.

The leading case is *Hembree v. State*, 546 S.W.2d 235 (Tenn.Crim.App.1976), in which the Court reasoned:

> The Sixth Amendment guarantees to a criminal defendant the right to effective assistance of counsel at every step in the proceedings. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *McKeldin v. State*, 516 S.W.2d 82 (Tenn. 1974). The last hour of a trial is an essential portion thereof. We hold that the Court erred in not adjourning at Midnight when counsel stated that they could no longer be effective and that they were not thinking clearly.
>
> We are also mindful of the fatigue of the jurors. We think that absent unusual and compelling circumstances, the jury should not be permitted to listen to evidence until 1:00 a.m. No reasonable cause was given for proceeding until this hour and a defen-

dant being tried for murder is not only entitled to reasonably alert counsel, but to witnesses who are reasonably alert and that the jury should likewise be clear-headed and not unduly fatigued. We think the 14th Amendment of the United States Constitution and Art. 1, § 8 of the Tennessee Constitution grants appellants these rights.

This is not to say that night sessions *per se* are improper under unusual circumstances; however, we do hold that night sessions should be terminated at a more reasonable hour, absent consent of the parties and all members of the jury.

*Id.* at 242–43.

In *Hembree,* the court convened at 9:00 a.m. and the defendants did not commence with their proof until 8:00 p.m. Around midnight, counsel for the defendants advised the court of their fatigue and requested that court be adjourned until the next day. The request was denied, and court was adjourned one hour later, after all of the evidence was heard. No circumstances as to why the trial court continued to hold court into the night were given.

Reiterating the holding of *Hembree,* this Court in *State v. McMullin,* 801 S.W.2d 826 (Tenn.Crim.App.1990), stated:

Late night court in criminal jury cases should be scheduled only when unusual circumstances require it, and not then if either defense counsel or any juror objects upon reasonably based grounds having to do with the lateness of the hour. Where late sessions are scheduled under the requisite unusual circumstances, good practice would be to let the record reflect the agreement of defense counsel and all jurors.

*Id.* at 832.

In *McMullin,* the trial commenced at 9:00 a.m. on the first day of trial and did not adjourn until 11:45 p.m. that night. The second day of trial commenced at 9:20 a.m. and the jury verdict was received and the jury discharged at 11:50 p.m. Of the 38 hours and 50 minutes that elapsed between the commencement and the end of the trial, the court was in session all except 9 hours and 35 minutes. As unusual circumstances, the trial court noted that it was a sequestered jury and that the jury was made up of twelve women. It was also noted that the trial judge had a plane reservation for the next day. This Court held:

[T]he stressful hours involved in the trial of this case, over the protest of the defendant's counsel, without the express agreement of the jurors, and without unusual and compelling circumstances, violates the rule laid down in *Hembree v. State, supra,* and constituted constitutional rights deprivations of the right to counsel and the right to due process of law requiring a reversal and a remand for a new trial.

*Id.* at 830.

The "threshold question which must always be determined by the court is whether the circumstances justify the unusual session." *State v. Parton,* 817 S.W.2d 28, 34 (Tenn.Crim.App.1991). In determining whether unusual circumstances existed in which to justify holding court into the evening, we note that the facts of the present case are similar to those found in *Holt v. State,* 591 S.W.2d 785 (Tenn.Crim.App.1979), where court was held until 10:05 p.m. on the second day of the trial, which was also a Friday. At 6:45 p.m. defense counsel informed the trial court that they were fatigued and requested that the case be continued to the next day. The trial court called a recess until 8:00 p.m. and resumed hearing evidence until 10:05 p.m. The reason for continuing the case was because it was Friday and the trial judge was anxious to complete the case before Sunday since the jury was sequestered. Moreover, when counsel complained of fatigue, the trial court recessed for one hour and fifteen minutes and then continued only two hours and five minutes past the recess. This Court held that this was not oppressive or unreasonable in light of the unusual circumstance that the jury should not be locked up on Sunday. *Id.* at 792.

In the present case, the trial court did not abuse its discretion in holding court until 9:35 p.m. Unlike the cases where a new trial was ordered, here, court was not held that late, and breaks were taken after counsel expressed their concern over being tired. Moreover, and more importantly, the present case is distinguished in that the only part which was held late was closing arguments. All of the proof was presented by 5:35 p.m. No prejudice has been demonstrated by appellant.

While the practice of holding court at night has been highly discouraged, we do not find reversible error in this case.

## DENIAL OF SUPPORT SERVICES

■ Next, the appellant contends that the trial court erred by denying his motion for support services. Specifically, the appellant submits that it was error for the trial court to deny counsel's request for a treatise on Tennessee death penalty litigation entitled "Tools for the Ultimate Trial," which was published by the Tennessee Association of Criminal Defense Lawyers. According to the motion, the book cost $40. Moreover, the appellant argues that it was unreasonable for the trial court to deny the request without any opportunity to be heard.

First, we note that the motion was not filed until after the pre-trial motion hearing was held. Moreover, nowhere in the record does it indicate that the appellant's counsel ever asked to be heard on the motion.

Second, as admitted by the appellant, this is not in and of itself reversible error. The statute pertaining to support services in death penalty cases is T.C.A. § 40–14–207(b), which provides in part:

> In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an *ex parte* hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

We do not find that the trial court abused its discretion in denying counsel's request for this handbook. Even if it was error, we find beyond a reasonable doubt that it was harmless.

## CO–DEFENDANT'S UNREDACTED STATEMENT

■ In his final issue, the appellant contends that the trial court erred by allowing the unredacted statement of co-defendant Poe into evidence and by failing to at least give a limiting instruction as to its use.

At the time of the appellant's trial, the applicable case was *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton,* the Supreme Court held that an inculpatory confession of a non-testifying co-defendant should not have been admitted in a joint trial with the defendant who had not confessed his participation in the crime. *Id.* at 128, 88 S.Ct. at 1623. Later, in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), a plurality of the Court held that admission of interlocking confessions (where a defendant's confession recites essentially the same facts as those of his non-testifying co-defendant), with proper limiting instructions, conforms to the requirements of the Sixth and Fourteenth Amendments. *Id.* at 75, 99 S.Ct. at 2140.

Following the trial in the present case, the Supreme Court held in *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), that where a non-testifying co-defendant's confession which incriminates the defendant is not directly admissible against the defendant, the Confrontation Clause of the Fifth Amendment bars its admission at their joint trial, even if a limiting jury instruction is given. *Id.* at 193, 107 S.Ct. at 1719. However, the Court held that any violation was subject to harmless error analysis:

> [T]he defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him (assuming the "unavailability" of the codefendant) de-

spite the lack of opportunity for cross-examination, and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless.

*Id.* at 193–94, 107 S.Ct. at 1719 (citations omitted). *See Also State v. Porterfield,* 746 S.W.2d 441, 446 (Tenn.1988), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

■ While we note that our Supreme Court has held that no *Bruton* violation exists where confessions of jointly tried co-defendants are similar in material aspects, *State v. King,* 718 S.W.2d 241, 247 (Tenn. 1986), the rationale of *Cruz* undercuts that decision. Further, a *Bruton* violation does exist where the confession of one non-testifying co-defendant contradicts, repudiates, or adds to material statements in the confession of the other non-testifying co-defendant as to expose him to an increased risk of conviction or to an increase in the degree of the offense with correspondingly greater punishment. *State v. Porterfield,* 746 S.W.2d 441, 445 (Tenn.1988).

No contemporaneous objection was made to the admission of co-defendant Poe's statements on the basis of an alleged Confrontation Clause violation either prior to or during trial.

■ It has long been established in Tennessee that a party cannot take advantage of errors which he himself committed, invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct. T.R.A.P. 36(a); *State v. Garland,* 617 S.W.2d 176, 186 (Tenn.Crim. App.1981). Moreover, Tenn.R.Crim.P. 12(b) provides that any defense, objection, or request which is capable of determination without trial may be raised before trial. Several matters must be raised prior to trial, including motions to sever and to suppress evidence. Failure to present these motions before trial amounts to a waiver of the issue. *State v. Eldridge,* 749 S.W.2d 756, 757 (Tenn. Crim.App.1988). While appellant filed a motion to sever on the basis of *Bruton* before trial, he withdrew it before a ruling.

Additionally, the only issue raised in the appellant's motion for a new trial is that the trial court erred in not giving limiting instructions on the use which could be given to the unredacted statement of co-defendant Poe. Failure to request a limiting instruction as to this evidence also results in waiver of the issue. *See State v. Howell,* 868 S.W.2d 238, 255 (Tenn.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *Laird v. State,* 565 S.W.2d 38, 40 (Tenn.Crim. App.1978).

■ We are cognizant that unpreserved *Bruton* errors can form the basis for a plain error reversal. *See State v. Ogle,* 666 S.W.2d 58 (Tenn.1984). Nonetheless, in this case, the jury convicted appellant of felony murder and not premeditated murder. Appellant testified during the trial and essentially confessed to felony murder. He admitted that he intended to commit the robbery and he admitted that he participated in the beating of the victim. In fact, he admitted that his intent was to knock the victim unconscious in order to accomplish the robbery. Given the nature of the codefendant's statement, which was more probative on the elements of premeditation and deliberation, and the jury's verdict, we do not find that the codefendant's statement had the "crucial effect" described in *Ogle.* In light of the overwhelming evidence of guilt, considering only the appellant's confession, his testimony and the other evidence presented, we find beyond a reasonable doubt that, even if this issue has not been waived, any error was harmless.

Having reviewed all of the issues raised by the appellant, and having found them to be without merit, we affirm the judgment of conviction.

WHITE, J., and ALLEN R. CORNELIUS, Jr., Special Judge.