# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### JULY SESSION, 1999

FILED

October 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9806-CR-00219 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | SULLIVAN COUNTY |
| VS. | ) | |
| | ) | HON. PHYLLIS H. MILLER, |
| STEVEN MARSHALL | ) | JUDGE |
| DEADRICK, | ) | |
| | ) | |
| Appellant. | ) | (Facilitation-Sale of Cocaine) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF SULLIVAN COUNTY

FOR THE APPELLANT:          FOR THE APPELLEE:

RICHARD A. TATE            PAUL G. SUMMERS
Assistant Public Defender   Attorney General and Reporter
P.O. Box 839
Blountville, TN 37617       MARVIN S. BLAIR, JR.
                            Assistant Attorney General
                            425 Fifth Avenue North
                            Nashville, TN 37243

                            GREELEY WELLS
                            District Attorney General

                            J. LEWIS COMBS
                            Assistant District Attorney General
                            Blountville, TN 37617

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Sullivan County Grand Jury indicted the Defendant, Steven Marshall Deadrick, for the sale or delivery of 0.5 or more grams of cocaine and for conspiracy to sell or deliver 0.5 or more grams of cocaine. The Defendant and his co-defendant, James Arthur Carnes, were tried together, and a Sullivan County jury found the Defendant guilty of the lesser included offense of facilitation of the sale of over one half a gram of cocaine. After considering the Defendant's criminal record and other pertinent factors, the trial court sentenced him as a Range III persistent offender to thirteen years incarceration and fined him $2,000.00. Pursuant to Rule 3 of the Rules of Appellate Procedure, the Defendant now appeals both his conviction and his sentence. We affirm the judgment of the trial court.

The Defendant's present conviction arises from events which occurred in early September 1996. At that time, Jerry Machen, Jr., a recovering drug addict, volunteered to work for the Kingsport Police Department's Vice and Narcotics Division and the Sullivan County Drug Task Force as a confidential informant in exchange for compensation. At the trial, Machen testified that he had known both Defendants for ten to fifteen years. Machen, who sold and installed carpet for his father's business, stated that in early September, he discussed with Defendant Carnes the exchange of carpet and installation for cocaine.

Machen met with officers on September 10, 1996 to set up a controlled buy with Defendant Carnes. Machen testified that prior to his meeting with Carnes, officers thoroughly searched both his person and his van before outfitting him

with a body wire. He located Defendant Carnes at an apartment inside Carnes' aunt's home, which Carnes was remodeling. Machen reported that Defendant Deadrick was also present and patted Machen down before he conversed with Carnes. Machen testified that he proposed giving Carnes $200.00 in exchange for five fifty-dollar bags of cocaine. He reported that Carnes refused, stating, "two of anyone else's make one of [mine]," and agreed to provide four bags for $200.00. Machen paid Carnes $203.00—$200.00 for the cocaine and $3.00 for some pickles which Carnes also sold. Defendant Carnes and Defendant Deadrick then left the apartment for fifteen to twenty minutes, reportedly to unload trash collected during the remodeling. Machen stated that upon their return, Deadrick again patted him down, and Carnes then gave him four bags of cocaine. Before leaving, Machen told Carnes that he would meet with him the following day to negotiate carpeting the remodeled apartments.

Machen testified that after leaving the apartment, he placed the bags into the pocket of his shirt; later, immediately after he got back into his van, he wrapped the bags in a napkin to prevent damage to them and placed them back into his pocket. When he arrived back at the prearranged location, he delivered the cocaine to law enforcement personnel. Officers searched him and the van a second time to ascertain whether he was in possession of any other illegal substances. They found no other drugs in the van or on Machen. The officers then de-wired Machen and his van and took a statement from him about the transaction.

On the following day, September 11, 1996, Machen again met with law enforcement personnel to discuss a second drug transaction. On this occasion,

Machen was to trade carpet and installation for cocaine. The officers gave Machen money for his purchase, and he proceeded to a carpet outlet to purchase the carpet. Machen then returned to the officers carrying the carpet in his van, submitted to a search of his person and his van, and waited for the officers to wire both him and his vehicle before proceeding to meet Defendant Carnes.

Machen went first to the home of Defendant Carnes' aunt, Mary Jane Carnes, who met him at the door and informed him that Defendant Carnes was at a nearby hair salon. Machen found Carnes and Deadrick working on a car outside the salon. Upon Machen's arrival, Machen and Carnes engaged in a heated discussion about the price of the carpet. According to Machen, Machen suggested that he receive "six fifties," which meant six fifty-dollar bags of cocaine, for the carpet, but Carnes thought that this idea was "ridiculous." Machen maintained that the two settled on a trade of "four fifties" for the carpet. Carnes instructed Machen to deliver the carpet to his aunt's home, and Machen testified that he did so. With the help of Mary Jane Carnes' son, Machen transported the carpet upstairs to the apartments and then returned to the hair salon.

Machen testified that when he arrived, Defendant Carnes and Defendant Deadrick were still there working on the car parked in front of the salon. Machen stated that Carnes asked him to go inside and wait. While inside, Machen picked up the pickles that Carnes had promised him the previous night. Shortly thereafter, Defendant Carnes and Defendant Deadrick entered the salon, and Deadrick pulled four fifty-dollar bags of cocaine out of his pocket. According to Machen, Deadrick asked, "it is four, isn't it?" to which Carnes responded, "yeah." Defendant Deadrick attempted to hand the bags to Carnes, who indicated to

Deadrick to instead hand them to Machen. Machen stated that he took the bags from Deadrick, put them into his shirt pocket, and after a short conversation with another man present at the salon, departed and headed to a predetermined location to meet with police. At the location, he turned over the cocaine and the pickles to Officer David Quillen and submitted to a search of his vehicle and person.

On cross-examination, Machen stated that he was a recovering addict and admitted that he had abused cocaine and alcohol for several years. He also testified that he had occasionally used marijuana. He conceded that he used cocaine in September 1996 and several times afterwards. He acknowledged that his use of drugs did affect his memory to a certain extent. Machen denied using cocaine while working with police in this case, but he did admit that he had used cocaine as recently as ten to twenty days before the trial. In addition, Machen stated that he had been convicted once in 1981 for possession of cocaine. Machen stated that he was paid approximately $200.00 per day for his work with the police on September 10 and 11 of 1996.

At trial, the State introduced the tapes made from Machen's body wire recorded on September 10 and 11. The tapes were often unclear or inaudible. They contained no overt references to the sale of cocaine, although on the tape from September 11, Defendant Carnes stated at one point, "Going [sic] in there and get me some damn baking soda, or . . . go out here, and get some hemp bullshit, and split the bag." The State also presented the jury with transcripts created from the tapes to aid the jury in its comprehension of the evidence on the tapes.

Officer David Street of the Kingsport Police Department introduced photographs at trial of Machen, Defendant Carnes, Defendant Deadrick, and Defendant Carnes' truck which were taken on September 10 and 11. He testified that he had worked surveillance both days, viewing the transactions between the Defendants and Machen from a nearby tower. He stated that for his surveillance he was supplied with binoculars, a camera, and two police radios, two channels of which maintained a connection with Machen's body wire. Photographs from September 10 depicting Defendant Carnes' truck, in which Officer Street testified that Carnes and Deadrick were riding, and photographs from September 11 showing all three parties were identified and introduced into evidence. Street also testified that on September 11, he supplied Machen with money for the carpet and took photographs of the carpet before Machen met with the Defendants to negotiate about the carpet. Street testified that although he never actually saw illegal activity from his vantage point, he did hear "deals being made."

Officer David Quillen of the Kingsport Police Department's Vice and Narcotics Division testified that he worked surveillance on September 10 and 11 and met with Machen following Machen's contacts with Defendant Carnes and Defendant Deadrick. He stated that he collected the cocaine from both drug deals, photographed the packets, and secured them in a locked filing cabinet at the Vice and Narcotics office until he delivered them to the Kingsport City Police Department the following Monday. He stated that he also thoroughly searched Machen and took statements from him after collecting the evidence.

Corporal Bill Farmer, the evidence custodian at the Kingsport Police Department, testified that he received the cocaine parcels from Officer Quillen. He stated that he logged the items in on an evidence sheet and returned them to Quillen in early October for analysis. He stated that he also received the audio tapes from the drug deals, and he noted that the tapes were checked out several times before the trial.

Richard Joyce of the Drug Enforcement Administration testified that he received possession of the cocaine packets from Officer Quillen on October 2, 1996 for the purpose of analysis. He stated that upon receipt of the packets, he processed them, put them in an envelope, and sent them to the DEA laboratory in Miami. Aruna Kumar, a forensic chemist at the DEA laboratory in Miami, testified that she received and analyzed the contents of the packets. She stated that each packet tested positive for cocaine. The purity of some packets tested at 85%, while that of others was found to be 84%.

Other law enforcement personnel involved in the transactions on September 10 and 11 also testified at trial and outlined their involvement in the case. Agent Brian Bishop of the Kingsport Police Department testified that on September 10, he met with Machen, searched him, and outfitted him with a wire transmitter before his meeting with the Defendants. He reported that Machen was lucid and did not appear to be under the influence of any illegal substance during their meetings. Bishop then listened to the transmissions from Machen's body wire during the transaction. He testified that when Machen returned, Machen gave him the baggies of cocaine, which he immediately turned over to Officer Quillen. Bishop stated that he searched Machen a second time after the

transaction. He also testified that on September 11, he met with Machen, again outfitted him with a body transmitter, and then listened to the transmission while Machen met with the Defendants. Later, when Machen returned, Bishop removed his body wire. His testimony concerning the contents of the transmissions from Machen's body wires generally matched the audio tapes introduced at trial and Machen's own testimony regarding the events of September 10 and 11.

Officer Mike Taylor of the Second Judicial Drug Task Force testified that on September 10 and 11, he searched Machen's van, rode with Agent Bishop, and monitored Machen's van and the transactions. He stated that he and Bishop were among other law enforcement personnel who followed Machen to and from their secured location. Taylor stated that despite his thorough search of the van, he found no contraband inside the vehicle.

Stanley Hodges of the Second Judicial District Drug Task Force testified that on September 10, he recorded the transaction between Machen and the Defendants. On September 11, he was assigned to listen to the audio tape of the transaction as it was being made and to act if an emergency arose. Otherwise, he was to keep Machen under constant surveillance during the transaction. He testified that on September 11, Machen was out of his direct view for approximately fifteen to twenty minutes at one point and approximately thirty minutes at another point during his meeting with the Defendants. Frank LaPoma of the Second Judicial District Task Force testified that he recorded the audio tape of the transaction on September 11 and took notes while monitoring the recording.

Defendant Carnes testified in his own defense. He denied ever selling cocaine and claimed that his income came from social security disability benefits, the periodic repair and resale of repossessed vehicles, and the sale of pickles. He explained that he regularly bought jars of homemade pickles from a friend at a local farmer's market and resold them for extra income. He claimed that he had sometimes paid "around twenty-nine thousand dollars ($29,000.00) a year taxes" on the income he made from the sale of pickles. He insisted that the tapes introduced at trial contained references to the sale of pickles, rather than the sale of drugs. Carnes claimed that Machen had approached him on September 10, asking for an "eight ball of cocaine," to which he responded, "I don't talk that, don't talk that to me," but maintained that no exchanges were made on September 10. He reported that his aunt, Mary Jane Carnes, paid Machen cash for the carpet and installation on September 11.

On cross-examination Carnes admitted that he kept no records of his pickle sales and did not pay taxes. He explained that because Mr. Fallin, the man from whom he bought his pickles, paid sales tax on the pickles, he was not required to pay anything further. He also admitted that in addition to his truck, he owned a BMW which he was "hiding" in a garage. He further admitted to driving a Jaguar which he had repaired, but he claimed that the vehicle belonged to his sister, who allowed him to drive it. He conceded that he sometimes drove other vehicles as well, including a Corvette, a Ford Explorer, a Plymouth convertible, and a Mazda Miata, which he had repaired but which he claimed belonged to other people. Furthermore, he admitted that sometimes he drove a Harley Davidson motorcycle, which he stated belonged to the owner of a custom repair shop. However, he did admit that the license tags on the motorcycle were

registered to his aunt, Mary Jane Carnes. Finally, Defendant Carnes acknowledged having rented several vehicles from different car rental agencies on several different occasions. He claimed he had used the vehicles to transport friends to basketball games in other cities and for other personal purposes.

Mary Jane Carnes, Defendant Carnes' aunt, also testified for the defense. She testified that her nephew, Defendant Carnes, Defendant Deadrick, and others had helped her install carpet in apartments in her home. She stated that Machen installed some carpeting on September 5, 1996, for which she paid him $200.00 in cash. She stated that a "week or so" later, Machen returned to install more carpet. On this occasion, she claimed that she again paid him $200.00. While Machen agreed through his testimony that Mary Jane Carnes had paid him for carpet and installation on September 5, 1996, he denied that she paid him anything thereafter, recalling that he saw her only briefly on September 10 and not at all on September 11. Ms. Carnes denied any knowledge of the Harley Davidson motorcycle which her nephew had acknowledged on cross-examination.

Defendant Deadrick did not testify at the trial. The transcript of the September 11 tape includes only one statement by Defendant Deadrick. Deadrick is quoted stating, "It was four, wadn't [sic] it," to which Carnes responds "Steve, yeah, four."

## I. AUDIO TAPES

The Defendant first argues that the trial court erred by allowing transcripts of the audio tapes made on September 10 and 11 to be admitted into evidence. He states, "The audio tape . . . would be the best evidence; that a transcript was what a third party thought he or she heard and would be misleading to a jury in this cause. He also contends that "the tape was inaudible at times and that the prejudicial value [of the tape] outweighed the probative value."

The Tennessee Supreme Court has held that "'tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.'" State v. Cameron, 909 S.W.2d 836, 850 (Tenn. Crim. App. 1995) (citing State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980)).

From a reading of the record, it appears that counsel for the defense initially objected to the admission of the tapes and later reconsidered their objections. The record also establishes the following: Machen, the confidential informant, from whose body wire the audio tapes were recorded, testified that he had listened to the tapes after the transactions and had reviewed the transcripts. He maintained that he was also familiar with the voices on the tapes. He stated that to the best of his knowledge, the transcript and tapes were accurate.

Stanley Hodges of the Second Judicial District Drug Task Force, who introduced the September 10 tape into evidence, testified that he monitored the conversations and recording on September 10, 1996. He stated that immediately afterwards, he marked the tape with his initials and delivered it to Officer David Quillen, who was in charge of the investigation. He concluded that the tape introduced at trial was the tape he recorded on September 10 and that the tape accurately recorded the events that he had monitored on that day.

Officer David Quillen, who introduced the September 11 tape on which the Defendant's voice is heard, testified that he followed Machen on September 10 and 11 and monitored all transmissions from Machen's body wire during the transactions. He stated that he had since listened a second time to both tapes and reported that both tapes were accurate and conveyed what he had heard during the initial transmissions. He also testified that when he collected the September 11 tape, he initialed it for identification purposes.

In addition, Frank LaPoma of the Second Judicial District Drug Task Force testified that he recorded the September 11 audio tape and had listened to the tape during its recording. He stated that he was also assigned to make notes of the tape during the transmissions, which he used at trial as a memory aid to recall the transaction. When initially presented with the tape in court, he stated that he was unsure from a visual inspection whether it was the tape he had recorded on September 11, 1996. However, the trial court allowed him to review the tape outside the presence of the jury, and afterwards, he stated that it was in fact the tape which he had recorded and that it contained an accurate portrayal of the September 11 events as he had heard them.

Before allowing the jury to hear the September 10 tape, the trial court instructed them as follows:

> I will give the Jury the following instruction. This exhibit, the transcript . . . purports to be a transcript of exhibit number 24 that we are about to play for you. The tape recording, not the transcript is the evidence. The transcript is given to you to assist you in listening to the tape recording, and following the tape recording. The transcript is difficult— the tape is difficult to distinguish at times. At times, there is outside noise. You should keep in mind that the tape is the evidence, and that only the statements, admissions or declarations of a defendant may be considered on the question of guilt or innocence. If you find that there is something in the transcript that you do not hear on the tape recording, or in other words, if there are discrepancies between the tape recording and the transcript, you are to disregard what is on the transcript because the transcript is not evidence. The tape recording is the evidence.

Based upon the foregoing, we conclude that the trial court committed no error by allowing introduction of the tapes and transcripts. The voices on the tapes were identified; a number of different witnesses stated that both the tapes and transcripts were accurate portrayals of the events of September 10 and 11; and the trial court duly instructed the jury that if they noted discrepancies between the tapes and the transcripts, they must disregard the transcripts and consider only the tapes as evidence. We find that witness testimony regarding the tapes and transcripts and the instructions given to the jury ensured that both the tapes and transcripts were sufficiently reliable for introduction into evidence. This issue is therefore without merit.

## II. SUFFICIENCY OF THE EVIDENCE

The Defendant next contends that the evidence presented at trial was insufficient as a matter of law to support the Defendant's conviction. Tennessee Code Annotated § 39-11-403 defines the crime of which the Defendant was convicted:

A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of a felony.

Tenn. Code Ann. § 39-11-403(a). The Defendant argues that "[t]he State presented no evidence that the defendant presented any assistance let alone substantial assistance in any criminal behavior activity. . . . The record is void that the defendant knew his co-defendant, Carnes, intended to commit a felony or that he knowingly furnished substantial assistance in the commission of the felony." In his brief, the Defendant implies that the evidence used to convict the Defendant was purely circumstantial.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing

State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

We only examine sufficiency relating to the September 11th transaction, as the trial court dismissed at the conclusion of the state's proof the count relating to the September 10th transaction.

Contrary to the Defendant's assertions, the State did present direct evidence that Machen obtained cocaine from the Defendants and that Defendant Deadrick participated in this transaction. Machen testified that Defendant Deadrick was present on September 11, and officers who monitored the transaction between the Defendants and Machen verified this report. In addition, photographs of the Defendants and Machen taken on September 11 were introduced into evidence. Machen also testified that the Defendant actually delivered packets of cocaine to him on September 11. Moreover, on the audio tape of the September 11 transaction, the Defendant is heard to ask his co-defendant, "It was four, wadn't [sic] it?" Machen explained that by making this statement, the Defendant was verifying how many packets of cocaine he should give Machen. Finally, the packets of cocaine were collected by officers and analyzed for content. Viewing the evidence presented at trial in the light most favorable to the State, we conclude that the State presented sufficient evidence from which a jury could have determined the Defendant's guilt. We therefore will not disturb the jury's finding on appeal.

## III.  SENTENCING

Finally, the Defendant argues that the trial court erred by sentencing him as a Range III persistent offender to thirteen years incarceration.  Although he states that the trial court erred by applying "certain enhancement factors," he provides no argument in support of this point.  Rather, it seems that he primarily disputes the trial court's decision not to apply mitigating factor (4), which states, "[t]he defendant played a minor role in the commission of the offense."  Tenn. Code Ann. §40-35-113(4).

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-401(d).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment.  State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Our review of the record from the sentencing hearing reveals that the trial court carefully considered the evidence presented at the trial and sentencing hearing, the Defendant's history, the enhancement and mitigating factors, and other relevant factors and sentencing principles. Therefore, we conclude that our review of the Defendant's sentence is de novo with a presumption that the determinations made by the trial court are correct. See Ashby, 823 S.W.2d at 169.

In sentencing the Defendant, the trial court considered the Defendant's criminal record. He had previously been convicted of two Class B felonies, one Class C felony, and three Class D felonies. The trial court applied the following enhancement factors:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
. . .
(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
. . .
(13) The felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:

-17-

. . .

    (B) Parole . . . .

Tenn. Code Ann. § 40-35-114(1), (8), (13)(B). The court applied the following mitigating factor: "The defendant's criminal conduct neither caused nor threatened serious bodily injury." Tenn. Code Ann. 4-35-113(1).

In concluding that mitigating factor (4) did not apply in this case, the trial judge stated,

> You played more of, a lesser role than Mr. Carnes, but I find that it was not a minor role considering the testimony of your actions the previous day, June 10, 1996 [sic], . . . when Mr. Machen went there to purchase cocaine and testified that you patted him down.
> So I think you knew very well what went on. You went, as I recall, with Mr. Carnes both times when he left and went to . . . the building where the Jazz Salon was located and then came back and sold the drugs. The first time, as I recall, you did not go in the building, even though Mr. Carnes stated that you did in his testimony. But, there's no testimony by the officers that you went in the building.
> So, it was just not as great a role as, as Mr. Carnes, but it was close.

We find no error on the part of the trial court in sentencing the Defendant to thirteen years incarceration. The trial court's finding that the Defendant played more than a minor role in the offense is adequately supported by the record, and the trial judge enunciated her reasoning for imposing the sentence which the Defendant received. We therefore affirm the sentence imposed.

Accordingly, the judgment of the trial court is affirmed.

                                  _____

                                  DAVID H. WELLES, JUDGE

CONCUR:

-19-

_____
GARY R. WADE, PRESIDING JUDGE


_____
JOE G. RILEY, JUDGE