# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 23, 2003

## STATE OF TENNESSEE v. ROBERT SIMERLY

**Appeal from the Criminal Court for Johnson County**
**No. 3855A      Robert E. Cupp, Judge**

---

**No. E2002-02626-CCA-R3-CD**
**March 11, 2004**

---

The defendant, Robert Simerly, appeals from his Johnson County Criminal Court conviction of first degree felony murder.  On appeal, he claims:

1.      The convicting evidence is insufficient.
2.      The trial court erred in allowing evidence of non-testifying co-defendants' and accomplices' statements that inculpated the defendant.
3.      The trial court erred in denying a mistrial when (a) an officer testified that, during pretrial questioning, the defendant requested an attorney, and (b) another witness testified that he had been threatened during the trial.
4.      The trial court erred in the admission of expert testimony.
5.      The trial court erred in the admission of a prejudicial videotape that depicted the deceased victim's face.
6.      The trial court erred in excluding the defendant's proffered evidence of judgments of convictions of two state witnesses.
7.      The trial court erred in failing to instruct the jury on a lesser included offense.

Discerning no reversible error in the proceedings below, we affirm the judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Clifton Corker, Johnson City, Tennessee, for the Appellant, Robert Simerly.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; Joe Crumley, District Attorney General; and Ken Baldwin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On the night of October 16, 1999, the dead body of Terrell Nelson, the victim and an inmate of Northeast Correctional Center (NECC), was found in his cell. Evidence admitted at trial showed that the victim had been killed by stab wounds to his lungs, heart, and brain. The defendant, who was an NECC inmate in the same pod as that of the victim, was convicted by a jury of the first degree felony murder of the victim. A co-defendant, James Randall Duncan, the defendant's cellmate, was convicted of facilitation of first degree felony murder.

### I.

In his first issue, the defendant challenges the sufficiency of the convicting evidence. To assess the sufficiency of the convicting evidence, the appellate court determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Shaw*, 37 S.W.3d 900, 902-03 (Tenn. 2001); *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn. 2000). As an appellate court, we afford the prosecution the strongest legitimate view of the evidence and the benefit of all reasonable and legitimate inferences which may be drawn from the evidence, and we defer to the trier of fact to weigh the evidence and to resolve all factual issues, including credibility issues. *Shaw*, 37 S.W.3d at 902-03.

As pertains to the offense charged in the present case, one commits first degree felony murder who kills another in the perpetration of or attempt to perpetrate robbery. *See* Tenn. Code Ann. § 39-13-202(a)(2) (2003). Also, a person is

> criminally responsible for an offense committed by the conduct of another if:
>
> . . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . .

*Id.* § 39-11-402 (2003).

In the light most favorable to the state, the evidence established that the defendant was criminally responsible for another's lethal stabbing of the victim, perpetrated during a robbery

-2-

of the victim. An NECC inmate testified that, on the morning of October 16, 1999, the defendant and others were angered because they believed that the victim had informed prison officers that the defendant and others were "cooking" whiskey in the defendant's cell. Inmates testified that the defendant expressed his intention to rob the victim, despite the pleas of other inmates that the defendant not pursue the plan.

In the early evening hours of October 16, 1999, inmate Glen Mellon saw the defendant, co-defendant Duncan, and inmates Mike Benson and Robert Dodd walk 40 or 50 feet from the defendant's cell to the victim's cell. Co-defendant Duncan sat on a trash can outside the victim's cell, and Dodd also remained outside "watching for [the defendant and Benson] while they were in the [victim's cell]." The defendant and Benson remained in the victim's cell about 20 minutes; when they emerged, the defendant was wearing the victim's robe and carrying two brown paper bags, and Benson carried a third bag. Duncan rose from his seat on the trash can and took the two bags from the defendant. The men went to the defendant's and Duncan's cell, and then Duncan procured a mop and bucket and began mopping the walkway between their cell and that of the victim.

Mellon testified that Duncan told him that Duncan had washed the clothes that he and the defendant had been wearing, cut the numbers from the clothing, and threw the clothing away. Mellon testified that the defendant sent Duncan to Mellon's cell to ask for bandages for a cut on the defendant's hand. Duncan told Mellon that Benson had "poked" out the victim's eyes. Mellon went to the defendant's cell and told the defendant that he had "really messed up," and the defendant said, "I know[.] I done [sic] something really bad." During this conversation, Duncan was washing blood from the defendant's sneakers. Duncan had a gold chain that Mellon recognized as belonging to the victim. In the defendant's and Duncan's cell, Mellon also saw a number of cartons of Doral cigarettes, the brand that the victim traded with other inmates.

Mellon testified that after the murder, at Duncan's request, he took eight rings to an inmate named Lorraine. Duncan later told him that one of the rings belonged to the victim. Mellon identified the ring.

On cross-examination, Mellon admitted that he had not revealed his knowledge about the murder until approximately ten months later.

Inmate Jeff Arwood testified that after prison officers came to the defendant's cell and seized "wine," Benson, Dodd, Duncan, and the defendant were "all mad and said they heard from the horse's mouth that [the victim] had snitched on them over their wine," and they were "going to kill that snitching, treejumping, so and so." Arwood echoed Mellon's testimony that later that evening, Dodd was walking back and forth in front of the victim's cell, while Duncan was seated on a trash can. After hearing a "thump," Arwood saw Benson and the defendant emerge from the victim's cell carrying paper bags. The defendant wore the victim's blue robe. Duncan took two bags from the defendant. Later, Benson came to Arwood's cell and showed him a large bruise on Benson's back. Arwood testified that Benson admitted to killing the victim.

On cross-examination, Arwood acknowledged that, during the investigation of the murder, he told the officers that he had seen nothing and that he had not revealed the facts about which he had testified until a week or two before trial.

Inmate Dana Johnson testified that he heard Duncan and the defendant discussing robbing the victim. On the evening of October 16, 1999, Johnson saw Dodd standing outside the victim's cell, and about 45 minutes later, Benson brought a bag containing ten packs of cigarettes to Johnson. Later, the defendant came into Johnson's cell and said that he had cut his hand playing basketball.

Department of Correction personnel testified that after inmate Lorraine had been transferred to a prison in Clifton, Tennessee, they seized from him a ring that belonged to the victim.

An officer testified that following the discovery of the victim's body, he searched the defendant's cell and discovered a shank[1] hidden behind a bed post. Another officer testified that she recovered the defendant's wet shoes from his cell. In the victim's cell, investigators found a green towel, a tee shirt in a trash can, and a piece of cardboard that bore a clear imprint of a sneaker or tennis shoe.

The state called both Benson and Dodd to testify. Benson invoked the Fifth Amendment to the United States Constitution when examined, and Dodd testified that his prior confession had been a lie. He denied participating in or having any knowledge of the robbery and murder of the victim.

The physician who performed the autopsy on the victim testified that the victim had been stabbed 67 times and that some of the wounds penetrated the lungs, heart, and brain.

Tennessee Bureau of Investigation (TBI) personnel testified for the state. Agent Shannon Morton testified that he recovered the victim's watch from a bag containing Duncan's personal property in Duncan's and the defendant's cell. The agent testified that Duncan told him that the watch must have been placed there by the defendant. In addition to the shank found behind the bed in the defendant's and Duncan's cell, the agent found two other shanks in trash cans in the pod's common area. Agent Morton investigated information that medical and investigative personnel had stepped on the piece of cardboard found in the victim's cell floor, and the agent was able to eliminate them as the contributors of the shoe print found on the cardboard.

A TBI laboratory technician testified that he had been trained in the analysis of tool marks and that he had analyzed two of the shanks found in NECC following the victim's murder. He compared two shanks – the one from the defendant's cell and one of the other shanks recovered – with stab or gouge marks embedded in a fragment of the victim's skull, which had been provided

_____

[1]A "shank" is a homemade knife found in prison. *State v. Donaven Brown*, W1999-00629-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Jackson, Sept. 14, 2000).

by the medical examiner. The technician testified that the shank from the defendant's cell left impressions in a test surface made of lead that were very similar to the impressions found in the victim's bone fragment. The other shank tested made dissimilar marks.

A second TBI technician testified as an expert that the shoe prints on the cardboard found in the victim's cell were consistent with the tread print from the defendant's sneakers.

A third TBI technician testified as a DNA expert that the defendant's blood was present on the towel and tee shirt found in the victim's cell.

The combination of direct and circumstantial evidence in this case supports the defendant's conviction of felony murder. The defendant and Benson went into the victim's cell with the intent of robbing him. They remained inside the cell for approximately 20 minutes, with one or two lookouts posted outside. While in the cell, the defendant was at least criminally responsible for the victim being stabbed 67 times. After the lethal assault, the defendant left the victim's cell wearing the victim's robe and carrying the victim's property. A shank that was consistent with a weapon that made impressions in the victim's skull was found in the defendant's cell, and when questioned about the treatment of the victim, the defendant admitted to another inmate that he had done "something really bad." In sum, the evidence firmly establishes that the defendant was criminally responsible for the killing of the victim committed in perpetration of robbery.

## II.

The defendant, relying upon *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), claims that the trial court erred in admitting into evidence testimony concerning out-of-court statements attributed to co-defendant Duncan and accomplice Benson. In *Bruton*, the Supreme Court held that the admission of a co-defendant's confession implicating the defendant in a joint trial violates the defendant's constitutional right of confrontation. The following chart lists the items of offending evidence mentioned in the defendant's brief and reveals whether, with respect to each item, the defendant contemporaneously objected.

| Witness | Declarant | Statement | Objection |
|---------|-----------|-----------|-----------|
| Mellon | Benson | "That g–d— Nelson told on us . . . [and we] ought go down there and rob that tree jumping SOB." | No |
| Mellon | Duncan | "[Duncan] said he washed the clothes [worn by himself and the defendant during the attack] and | No |

| | | he cut the numbers out of the clothes and throwed [sic] [them] away." | |
| --- | --- | --- | --- |
| Mellon | Duncan | That Benson told Duncan that Benson had "poked Mr. Nelson's eyes out." | No* |
| Mellon | Duncan | That Duncan had tried to convince the defendant not to rob the victim. | No |
| Mellon | Benson | That Dodd and Benson were "upset . . . about Duncan not upholding his end of the deal to take care of them." | No |
| Johnson | Unspecified | The defendant, Duncan, Benson, and Dodd conversed about robbing the victim. | No |
| Arwood | "they" | "They was [sic] going to kill [the victim]." | No |
| Arwood | Benson | "I killed [the victim]." | No |
| Morton | Duncan | That the defendant must have put the victim's watch among Duncan's personal effects. | No |

\* Objection was based on the hearsay rule.

"[The *Bruton*] rule is designed to avoid presenting evidence to the jury without affording them the opportunity to evaluate the context in which the statement was made and the veracity of its maker." *State v. Zirkle,* 910 S.W.2d 874, 891 (Tenn. Crim. App. 1995) (citing *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965)). The mere finding of a *Bruton* error, however, "does not automatically require reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430, 92 S. Ct. 1056, 1059 (1972). When the remaining evidence of guilt is overwhelming, "and the prejudicial effect of the codefendant's admission is insignificant by comparison, the *Bruton* error is harmless beyond a reasonable doubt." *Id.*, 92 S. Ct. at 1059.

In the present case, not only were the alleged *Bruton* errors unattended by a contemporaneous *Bruton*-based objection, *see* Tenn. R. Evid. 103 (timely objection "stating specific ground of objection" necessary to preserve claim of erroneous admission of evidence), but none of the claims listed in the defendant's brief was raised in the motion for new trial.[2] Chiefly for these reasons, we hold that the claims of *Bruton* errors are waived.[3] *See* Tenn. R. App. P. 3(e) (errors which, if established, would yield a new trial are waived if not "specifically" raised in the motion for new trial).

Of course any *Bruton* errors, when otherwise waived, may be noticed as plain errors. *See State v. Ogle*, 666 S.W.2d 58 (Tenn. 1984). However, when the properly admitted evidence overwhelmingly establishes the defendant's guilt such that the *Bruton* error is harmless beyond a reasonable doubt, plain error treatment is not appropriate. *See State v. Cameron*, 909 S.W.2d 836, 853 (Tenn. Crim. App. 1995). We conclude that such is the case here. Eyewitness testimony established that the defendant and Benson entered the victim's cell. Circumstantial evidence established that, during their 20-minute stay in the cell, the victim was stabbed 67 times. The defendant sustained a cut to his hand. His blood and footprint were found in the victim's cell. Witnesses saw the defendant emerge from the victim's cell, wearing the victim's robe and carrying two bags which were circumstantially shown to have contained the victim's property. Officers found a shank in the defendant's cell which was consistent with the type of weapon that made impressions in the victim's skull. The defendant admitted to Mellon that he had "messed up" and had done "something really bad." Based upon this evidence and the inferences that the jury logically drew from the evidence, the state overwhelmingly established the defendant's criminal responsibility for Benson's killing of the victim. Thus, we decline to notice any plain error in the use of the instances of claimed *Bruton* error. *See State v. David Johnson*, No. W1998-00687-CCA-R3-CD, slip op. at 19 n.6 (Tenn. Crim. App., Jackson, Mar. 14, 2001) ("Because any error was harmless, it would not 'affect the substantial rights' of the defendant, and [appellate courts may] decline to notice it as plain error.") (quoting Tenn. R. Crim. P. 52(b)), *perm. app. denied* (Tenn. 2001).

### III.

During trial, the trial court denied two defense motions for a mistrial. The first motion was based upon TBI Agent Morton's testimony that during questioning following the murder, the defendant requested an attorney. The second motion for a mistrial related to the

---

[2]In his motion for new trial, the defendant raised one specific *Bruton* issue; however, this issue was not preserved in the defendant's brief on appeal. *See* R. Tenn. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

[3]By effectuating the requirements of Tennessee Rule of Appellate Procedure 3(e), we do not address the issue whether any of the listed out-of-court statements fall within the *Bruton* rule. Of the statements listed, three are arguably post-crime statements of a co-defendant. Many of the others, although hearsay, may have been admissible at least pursuant to the terms of an exception to the hearsay rule. *See* Tenn. R. Evid. 803(1.2). Perhaps they may pass muster pursuant to the confrontation clause, as well. At any rate, this court does not in this opinion determine whether any of the listed statements fall within the aegis of the *Bruton* rule.

testimony of inmate Glen Mellon, a prosecution witness, that he had been threatened that morning before court.

Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McGivney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrook*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. *State v. Atkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

**(a)**

During direct examination as a prosecution witness, TBI Agent Morton described his investigation of the victim's murder. He recounted his interview with the defendant, in which the defendant stated that he had cut his hand playing basketball, and then "he stopped answering questions and asked for an attorney." At this point, the defendant objected, and the trial court *sua sponte* delivered the following admonition to the jury:

> Okay, ladies and gentlemen, I'm going to instruct you, he has an absolute right not to say anything. The fact that he was asked that and requested an attorney is of no significance to you. That's his absolute right. . . . Do you understand that? As to the last remark by this witness, I'm going to order that struck.

The admonition notwithstanding, the defendant, outside the hearing of the jury, moved for an order of mistrial. The trial court denied the motion and further instructed the jury:

> Ladies and gentlemen, . . . [y]ou have a constitutional absolute right not to talk about anything. You can exercise that right at any time that you want to. The fact that you exercise that right, you can't draw any implications from that. You can't conclude simply because they may have been asked to give a statement and they chose not to, you can't draw any implication from that. Do each of you understand that? Can each of you understand? Let me see your hand if you can understand that. Okay. Go ahead.

"That a defendant has a constitutional right to remain silent in the face of accusations against him, not only during his trial but also upon arrest and while in custody, is a rule so fundamental as to require little elaboration." *Braden v. State,* 534 S.W.2d 657, 660 (Tenn. 1976). "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S. Ct. 1602, 1625 n.37 (1966). To find harmless error beyond a reasonable doubt in admitting a testimonial

-8-

reference to a defendant's request for an attorney in the face of interrogation, the appellate court "would have to conclude that, absent the evidence of pretrial silence . . . , 'no juror could have entertained a reasonable doubt as to defendant's guilt." *Braden*, 534 S.W.2d at 661.

Although Agent Morton's comment was improper, we cannot conclude that the trial court abused its discretion in denying a mistrial. The agent's comment was the sole reference during a four-day trial to the defendant's invoking his right to counsel. The state did not elicit the comment and did not exploit the comment in its arguments. The trial court acted quickly to give the jury an immediate, remedial instruction, and then the court delivered a more emphatic instruction and solicited the jury's response. Apparently, the jury members raised their hands to indicate their understanding of the judge's admonition. Finally, as we have mentioned in the first two segments of this opinion, the evidence against the defendant was strong and suggests that the jury would have been compelled to convict the defendant in the absence of the erroneous comment. Thus, the record evinces no manifest necessity for a mistrial order, and the trial court did not abuse its discretion in denying one. *See, e.g., State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000) (no manifest necessity for a mistrial found when the state introduced "a multitude of evidence" against the defendant and the jury was instructed to disregard inappropriate statements; court commenting that juries are presumed to follow court's instructions).

**(b)**

During the state's re-direct examination of inmate Glen Mellon, the witness testified that he had originally failed to disclose his knowledge of the murder of the victim because he feared that he would be killed in prison. When asked by the prosecutor whether he was afraid because his life had been threatened, Mellon responded, "Yes, sir, when the word got out. My life was threatened this morning." The defendant's attorney, out of the presence of the jury, moved for an order of mistrial and commented on the record that, when Mellon testified to being threatened, he looked at the defendant seated in the courtroom. Commenting that Mellon had not claimed the defendant was responsible for the threat, the court denied the motion. When the jury returned, the trial judge instructed them:

> Ladies and gentlemen, . . . the last statement he made, you're to disregard that. It has nothing to do with this trial. . . . [H]e made the statement without anybody's knowledge. . . . [I]t has no bearing on this [trial], but I want to assure you that Mr. Simerly or Mr. Duncan [were] not part of what that statement was about. Do each of you understand that?

The defendant has failed to convince us that the trial court abused its discretion in denying the motion for a mistrial. The evidence demonstrated that in the prison milieu, persons who "snitch" are imperiled. The evidence in the case suggested to the jury that, as a prosecution witness, Mellon would likely have been subject to ridicule and threats. In any event, we conclude that "the trial court's curative instruction solved the problem." *See State v. Blackman*, 701 S.W.2d 228, 233

(Tenn. Crim. App. 1985). The instruction was contemporaneous to the offending testimony and, the trial court elicited an apparently affirmative response from the jury members that they understood the court's pronouncement that the defendant was not implicated in the threat mentioned by Mellon. Thus, this issue gains no purchase on appeal. *See Brown*, 53 S.W.3d at 284 (jury is presumed to have followed court's instructions).

## IV.

In his next issue, the defendant claims that the trial court erred in allowing a TBI technician to testify as an expert on tool mark impressions that the shank found in the defendant's cell was essentially consistent with the instrument that left impression marks in the victim's skull.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

"If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Moreover, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* 401. Generally, relevant evidence is admissible, unless otherwise barred; irrelevant evidence is inadmissible. *Id.* 402.

The state's evidence in qualifying the TBI technician as an expert in the area of tool mark analysis[4] showed that the technician held a bachelor's degree in biology and chemistry. He had worked in the TBI laboratory for fifteen years, during the first two of which he had undergone a "very intensive training program that included . . . the tool mark identification work." The witness had then garnered thirteen years' experience in tool mark analysis working in the TBI crime laboratory. He had previously been qualified as an expert and had testified as a tool mark analyst in fifteen to twenty cases not involving firearms and in excess of 200 cases involving firearms.

Based upon the record, we conclude that the trial court acted within its discretion in ruling that the witness was qualified to testify as an expert. It is clear that the witness possessed scientific, technical, and specialized knowledge, experience, and training that, when relevant in a

---

[4]The witness testified that "tool mark" analysis or identification is a process of examining the resulting impressions or marks when "two objects come into contact with one another and they move across each other or they move toward each other." The process relies upon the fact that "tools are made and ground down to a particular surface [and have] individual characteristics . . . in their surface." When impressed into a surface, the tool "very often leaves an impression of [the tool's] individual characteristics." In attempting to identify a tool as the instrument leaving forensic impressions, the technician uses the suspect tool to make test impressions "to determine just exactly how that particular tool marks items that it comes into contact with." The test marks are then compared to the "actual evidence impressions."

-10-

given case, would substantially assist the trier of fact. The defendant has shown no error in the trial court's acceptance of the witness as an expert.

The defendant also challenges the merit of the witness' conclusions about the tests he performed on two shanks recovered from the defendant's pod at NECC. On this point, the defendant posits that the witness' testimony was so "speculative that it is no longer of substantial assistance to the jury or is in danger of being misleading or confusing."

In his substantive testimony, the witness explained that he analyzed the impressions left in the victim's skull by the instrument that was used to stab him. He compared these impressions to impressions left by the shank recovered from the defendant's cell and a second shank recovered after the homicide from the defendant's pod at NECC. He used the two shanks to create test impressions in sheets of lead and then compared the test impressions with the impressions left in the victim's skull. He determined that the diamond-shaped impression made by the shank recovered from the defendant's cell was "very, very similar in shape and size to the impressions . . . in the bone." The three-sided test impression made by the other shank was dissimilar to the bone impression, and he eliminated this shank as the cause of the impressions in the victim's skull. He thought it significant that the shanks were not mass produced and could not be "identically reproduced." He acknowledged that he could not say "with any degree of certainty that this shank [from the defendant's cell] made the impressions in the bone, but [the homemade nature of the shank lends] some more significance to this correlation between the shape and size of the test impression and the impressions in the bone." The defendant objected, in essence, to the relevance of this testimony. The trial court overruled the objection, holding that the degree of certainty is a matter of weight of the evidence, not admissibility.

On cross-examination, the following exchange occurred:

Q      [Y]ou're not saying to this jury within any degree of certainty
       . . . that was the shank that caused the injury?

A      That's correct.

Q      And when I say any degree of certainty, you're saying you
       don't know?

A      I don't know for certain, no, sir.

Q      And – well, you don't know with any degree of certainty?

A      That's correct.

       . . . .

Q      Now one of the reasons is that you can't – there are insufficient individual characteristics that you've analyzed that helps you conclude that this was the shank?

A      There are . . . insufficient individual characteristics in the bone fragment for me to come to a conclusive opinion about this.

. . . .

I would never state with a degree of certainty. I would say it either did cause them or it could have caused them. That's about the only thing I could say.

First, we address the issue of whether the expert witness' testimony was relevant to the issue at stake. We hold that because the expert's findings and opinion had "a tendency to make the existence of [the fact] more probable than it would be without the evidence," the evidence was relevant. *See* Tenn. R. Evid. 401. The appellate courts of this state have held that the "consistent with" nexus of a weapon to a wound or to a projectile supplies the probability required by Rule 401. *See, e.g., State v. King*, 718 S.W.2d 241, 251 (Tenn. 1986) (opinion on petition to rehear) (skull fragment findings were "*consistent with* an injury from a bullet fired from a high-powered rifle at close range" and were relevant) (emphasis added); *State v. Ladonte Montez Smith*, No. M1997-00087-CCA-R3-CD, slip op. at 30 (Tenn. Crim. App. Nashville, Dec. 17, 1999) ("In the present case, evidence of the photographs and some of the weapons was relevant. Some of the ammunition recovered from Ashby's house was of a type that was *consistent with* a firing pattern at the [scene of the crime].") (emphasis added); *State v. Oody*, 823 S.W.2d 554, 565-66 (Tenn. Crim. App. 1991) ("The wounds to the skeleton were *consistent with* having been caused by that particular ax. . . . We think that the evidence meets the definition of relevancy.") (emphasis added).

The determination that the expert's testimony was relevant does not dispose of the defendant's challenge to the testimony, however. We must determine whether the probative value of the expert evidence outweighs its prejudicial effect. *See State v. Hall*, 958 S.W.2d 679, 709 (Tenn. 1997); *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). We conclude that the probative value outweighed any danger of unfair prejudice or of confusion or misleading of the jury. The defendant admitted to possessing the shank found in his and Duncan's cell. The expert provided a scientific – although not preemptive – linkage between this weapon and the victim's wounds. The jury, enabled by the trial court's admonitory instruction on the hazards of expert testimony, was capable of understanding the "consistent with" nature of the expert's testimony and assigning it commensurate weight. Thus, we discern no basis for excluding the relevant testimony of the tool mark expert.

## V.

The defendant claims that the trial court erred in admitting into evidence a videotape that showed "close-up" the deceased victim's face. The state argues that the issue is waived because the videotape is absent from the appellate record.

As the appellant, the defendant bore the burden of ensuring an appellate record that fully and fairly represented the issues that form the bases of the appeal. Tenn. R. App. P. 24(b). Thus, we cannot embark upon our review of the issue when the videotape is absent from the record.[5] In such a situation, we presume the trial court's ruling to be correct. *See Oody*, 823 S.W.2d at 559.

## VI.

In his next issue, the defendant claims that the trial court erred in rejecting his bid to introduce copies of Benson's and Dodd's judgments of convictions of homicide in connection with the victim's murder. In his brief, the defendant argues that he should have been allowed to introduce the judgments to attack the credibility of Benson and Dodd pursuant to Tennessee Rule of Evidence 609(a). Apparently, the defendant attempted to introduce the conviction judgments at the conclusion of the defendant's case-in-chief.

In pertinent part, Rule 609(a) states

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted *if the following procedures and conditions are satisfied*:

(1) *The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record.* If the witness denies being the person named in the public record, identity may be established by other evidence.

Tenn. R. Evid. 609(a) (emphasis added).

Even if we were to ascribe to Benson the status of a witness, we reject the defendant's Rule 609(a) claim as to both Benson and Dodd. The defendant did not follow the required impeachment procedure set forth in the rule. The witnesses who were sought to be impeached were

_____

[5] "Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003). The admission into evidence of photographs of victims is committed to the sound discretion of the trial court. *State v. Webster*, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002). The courts typically find no abuse of discretion when the photographs are "relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Carter*, 114 S.W.3d at 902 (quoting *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978)).

not "asked about the conviction on cross-examination." The witnesses were given no opportunity to admit or deny the convictions, the scenario through which the defendant would have been permitted to use the public record to establish the convictions. Thus, the defendant may not place the trial court in error on the basis of his belated and ineffectual attempt to introduce impeaching convictions.

## VII.

In his final issue, the defendant claims that the trial court erred in failing to instruct the jury as to the lesser included offense of facilitation of first degree felony murder. The trial court instructed the jury as to the lesser included offenses of second degree murder and voluntary manslaughter but not as to facilitation.[6]

A person is "criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003). "The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged." Id. § 39-11-403(b) (2003). Facilitation is a lesser included offense of first degree felony murder. State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001). "Tennessee Code Annotated section 40-18-110 mandates giving an instruction on every offense 'included' in an indictment." Ely, 48 S.W.3d at 718. See Tenn. Code Ann. § 40-18-110 (1997) (amended Jan. 1, 2002, Acts 2001, ch. 338, § 2). Our supreme court has interpreted this provision to mean that "a trial court must instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." Ely, 48 S.W.3d at 718 (quoting State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999)).

With respect to facilitation as a lesser included offense, "proof of the greater offense will not necessarily prove the lesser offense." State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). In this situation,

> [T]he court must determine whether any evidence exists that reasonable minds could accept as to the application of a lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. [Next], the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

---

[6]The trial court instructed the jury as to facilitation on the felony murder charge against co-defendant Duncan, and Duncan was convicted of facilitation.

*State v. Genore Dancy*, No. W2001-02451-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Jackson, Feb. 18, 2003) (citations omitted).

In the present case, the evidence showed that the defendant, Dodd, Benson, and Duncan planned to rob the victim. Benson and the defendant entered the victim's cell; Benson stabbed and killed the victim, and 20 minutes after entering the cell, each emerged carrying items of the victim's personal property. The defendant was wearing the victim's robe. Thus, the evidence that places the defendant squarely in the robbery enterprise inculpates him through complicity in the felony murder. *See State v. Robert Michael Winters*, No. E2002-00160-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Knoxville, Nov. 7, 2003) (an analysis of a defendant's criminal responsibility for the act of another in committing felony murder does not involve application of the "natural and probable consequences rule" for purposes of instructing the jury). Thus, reasonable minds could not accept that the defendant was guilty only of the lesser offense of facilitation. For this reason, the evidence does not justify an instruction on the lesser included offense of facilitation.

Nevertheless, were the evidence to be viewed as justifying – and hence requiring – the instruction as to facilitation, the error would, in our view, be harmless beyond a reasonable doubt. Our supreme court has said that the error may be harmless beyond a reasonable doubt "when the omitted element was uncontested and supported by overwhelming and uncontroverted evidence." *Allen*, 69 S.W.3d at 190. Essentially then, the error is harmless when it appears "beyond a reasonable doubt that the error did not affect the outcome of the trial." *Id.* at 191. We believe that to be the situation in the present case. The defendant's role as an accomplice in the robbery, as opposed to a mere facilitator, was firmly established in the evidence and was not meaningfully controverted. In this situation, any error in failing to instruct the jury as to facilitation was harmless beyond a reasonable doubt.

## VII.

In conclusion, we discern no reversible errors in the proceedings below. As a result, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE